Wetter et al. *v.* City of Indianapolis, Indiana, et al.

[No. 30,455. Filed June 8, 1967. Rehearing denied September 11, 1967.]

*John J. Dillon,* Attorney General, *Edwin K. Steers,* Former Attorney General, *John J. McShane,* Former Deputy Attorney General, *Edward H. Knight, Edward O. Snethen* and *Alex M. Clark,* all of Indianapolis, for appellants.

*James W. Beatty,* Indianapolis Corporation Counsel, *Michael B. Reddington,* Former Corporation Counsel, *John E. McCann, Jr.,* Indianapolis City Attorney, *Robert D. Risch, George B. Gavit, Sam Trueblood* and *Ice Miller Donadio and Ryan, of counsel,* all of Indianapolis, for appellees.

ARTERBURN, J.—The plaintiffs-appellants, as taxpayers and members of the general public, brought this class action in 1957 against the City of Indianapolis, et al., the appellees, to enjoin the city from utilizing certain real estate in the City of Indianapolis known as the East Market site for any purpose other than a city market, to mandate the city to budget and levy taxes, to maintain the real estate and improvements known as the "City Market," and to rebuild Tomlinson Hall on part of the site. In 1958 Tomlinson Hall was partially destroyed by fire, causing a vacation of a large part of the market space on its ground floor. The city proposes to use the site to construct a public garage for off-street parking.

In 1958 a temporary injunction previously granted the plaintiffs was dissolved, and a final decree and judgment on behalf of the city was entered, denying the relief prayed for. From this judgment the taxpayers appeal. The appeal went first to the Appellate Court. However, under the Acts of 1967, ch. 357, this appeal was transferred on April 24, 1967, to this Court. See also: *Wetter* v. *City of Indianapolis* (1966), 247 Ind. 586, 219 N. E. 2d 911.

The land involved is the South Half of Square 43 located between the boundaries of Delaware, Market, Alabama and Wabash Streets in the City of Indianapolis. There now exists a market open to the public on this site which has been maintained as a public market by the City of Indianapolis from prior to 1833 to the present time. At first the site was an open-air market, and later buildings built by public subscriptions, with the general funds of the City of Indianapolis, and by gift housed the market site. Among other buildings on this one-

half block was Tomlinson Hall which was built partially with contributed funds. The upper two stories of Tomlinson Hall were used as a meeting hall, for the presentation of shows, dances, and other public events, while only the first floor was used for market purposes. As related previously, Tomlinson Hall was destroyed by fire in January, 1958.

The title to the tract in particular and to the area now occupied by the City of Indianapolis was ceded to the United States by Indians in a treaty of St. Mary's Ohio. By virtue of an Act of Congress approved March 3, 1819, and an Act of the Indiana General Assembly approved January 11, 1820, commissioners were appointed to select land as a permanent site of government of the State of Indiana. The commissioners were authorized to lay out and plat one section of land of one square mile as the initial site of a town to be called Indianapolis, which original plat, as finally prepared, was approved by an act of the General Assembly on January 6, 1821. The site was bounded by North, East, South and West Streets. The plat was filed in the Secretary of State's office in June, 1821. This plat is made an exhibit in this case, and we find thereon the South Half of Lot or Square 43 designated "Market" and subsequent plats thereafter as "Market Square, City Market." We also find on the plat a site in the middle of what is known as Circle Street marked "Governor's Circle" which is now occupied by the Soldiers and Sailors Monument, a spot marked "Court House" which is now occupied by the City-County Building, a place marked "University Square" which is now used as a park. We also find on the plat the South Half of Square 50 marked "Market" which is also known as "West Market Square," to distinguish it from the Market Square with which we are here concerned, which is also known as "East Market Square." With reference to the latter site (West Market Square, South Half of Square 50), we are informed by the briefs that this was never used as a market site and in 1837 was taken over for the new Central Canal, which is still lo-

cated there. We are also informed that this West Market Square site was exchanged with the State of Indiana for the North Half of Square 48, and the State in the deed referred to it as "a market space." This market space or market site was used for a short time as a second market on the west side and later was taken over again by the State of Indiana, and is part of the ground upon which the State Capitol is now located and is the ground referred to in what is known as the *Ketcham Case* [*The President, &c.*, v. *The City of Indianapolis* (1859), 12 Ind. 620], of which case we shall have more to say later in this opinion.

It will be noted, therefore, as a historical fact, that there have been various sites and tracts of land within the City of Indianapolis that have been designated by the State of Indiana through deeds or plats for certain public purposes at the time and which, through the years, have been changed and altered as to their public use.

The appellants stress heavily the fact that the legislature, by the Act of 1947, ch. 20, authorized the deeding of all interest of the State in the Market Square in controversy here to the City of Indianapolis, and in the preamble of the Act it recites:

> "Whereas, Lots four (4) and nine (9) inclusive in the south half of Square forty-three (43), as laid out and numbered in the original survey of the City of Indianapolis, made in 1821 and approved by the Legislature on November 28, 1821, (Acts of 1821-2, p. 18, Indiana General Assembly), was marked 'Market Square' and dedicated by the State of Indiana as a public market place."

The appellant's contention is summed up by the following statement:

> "Thus, the State of Indiana, by such official plat of 1821, as duly legalized, offered to dedicate the land here in issue for use as a public east market, if and when it should be accepted and used by, or for, the general public; thereby completing the *irrevocable dediction* of such land, and creat-

ing the public easement, as such interest in said land, that would so vest in the general public, as the beneficiaries of such donation, whenever such use of the land as a public market was begun and so long as so continued by the public.

\* \* \* \* \*

"Such acceptance and use of such donated land completed the irrevocable dedication thereof for such exclusive market use." (Our italics)

The appellants rely to a large extent on cases and quotations setting up charitable trusts by private individuals who donate their private property to some public agency for that purpose. We do not feel these cases are analogous to the present situation. Here the property in question was owned originally by the public and simply donated for a public use without the words "irrevocably" or "in perpetuity" being used. There is no semblance of the creation of a trust in the mere transfer of property by a state to one of its agencies for some public use. The designation by the state or one of its instrumentalities of any particular property for a public or governmental use does not create contractual rights in the public to insist upon such use being made "irrevocable" and "in perpetuity." Under the principles advocated by the appellants in this case a state or its governmental agency would put itself in a straight jacket and tie its hands in the use of such public property as it may possess for all future purposes, regardless of changing times. Such a principle would violate sound public policy.

Appellants emphasize the word "dedicated." It does not, in our judgment, have by necessary implication the legal significance of "irrevocable" and "in perpetuity." Generally speaking, we "dedicate" a bridge, park, public auditorium or other governmental works to the purpose for which they were constructed. Yet this does not mean that they are placed irrevocably and in perpetuity to such purpose and use and that the state has lost control thereafter to alter such use as time and change require. 1 Bogert, *Trusts and Trustees,* § 34, p. 271 supports this position.

In *Reichelderfer* v. *Quinn* (1932), 287 U. S. 315, 53 S. Ct. 177, 77 L. Ed. 331, the Supreme Court of the United States said with reference to land acquired for park purposes by an Act of Congress which was later used in part for other purposes:

> "It has often been decided that when lands are acquired by a governmental body in fee and dedicated by statute to a park purpose, it is within the legislative power to change the use.
>
> \* \* \* \* \*
>
> "Thus construed, the dedication of the park, a declaration of a present purpose, does not imply a promise to neighboring land-owners that the park would be continued in perpetuity."

Governmental bodies hold all property in which the public is interested, such as streets, alleys, public squares, commons, parks, and wharves for the use of the public generally. No one could logically contend that such governmental bodies do not have the right to vacate and change or alter this public property as such governmental bodies see fit in the public interest.

In *MacDonald* v. *Board of Street Com'rs of City of Boston* (1929), 268 Mass. 288, 167 N. E. 417, land was conveyed to the city and the deed provided that a public street was to be built on it. Thereafter the city sought to discontinue the street, vacate it, and sell the land. An action was brought on the theory of a public trust to prevent such sale. The court stated:

> "There are no words to the effect that the conveyance is upon a perpetual trust. If a trust had been intended, words indicative of that design reasonably might be expected in a conveyance affecting valuable real estate in Boston so recently as 1879. While no particular words are necessary to the creation of a trust, some words in connection with attendant factors must point to a trust or none is established."

The laws of Indiana have long recognized the authority of a city to determine the proper use of its public property. The Cities and Towns Act, Ch. 129, Acts 1905, contains the following provision which is still in force and which empowers the City of Indianapolis:

"To lay out, open, *change*, vacate and to fix or change the grade of any street, alley or *public place* within such city, and to design, order, contract for and execute the improvement or repair of any street, alley, wharf or public place within such city." (Emphasis added). Burns' Ind. Stat. Anno. § 48-1902 (1963 Repl.)

"To authorize the alienation and conveyance of any property, real or personal, belonging to such City, whether used for public and governmental or for private purposes: . . ." Burns' Ind. Stat. Anno. § 48-1407 (1963 Repl.)

The appellants seek to avoid this well recognized principle applicable to streets, highways, parks, and like property by the contention that changing methods of transportation and traffic require widening, vacating, and changing the routes of highways. We can see no difference in the present situation except one of degree as to other public property which may be subject to changing times and modes of living.

Finally, the appellants contend that the *Ketcham Case* [*The President, &c.,* v. *The City of Indianapolis* (1859), 12 Ind. 620] is decisive of the question here presented. This case concerned the West Market site, as distinguished from the East Market site with which we are here concerned. The West Market site was acquired by the City of Indianapolis by exchanging the South Half of Square 50 (which was designated as a market site on the original plat of Indianapolis), for the North Half of Square 48 (which is now part of the State Capitol grounds). This latter tract of land (North Half of Square 48) was levied on by Ketcham as a result of the judgment against the city and sold on execution. This Court held the sheriff's sale was a nullity, and the Market site was

not subject to sale on execution because it "was dedicated by the State to a public use, namely a market space." However, we find what is said in that opinion additionally as to the City of Indianapolis being "a trustee" of this property, and the City of Indianapolis has no right to dispose of it "by sale or otherwise," is dicta in that opinion and unnecessary to the decision. It was a well settled principle of law at that time and has been throughout the history of the State of Indiana that public property held by a governmental body is not subject to execution, regardless of whether or not it be "dedicated" or held in "trust." The mere fact alone that property is held by the state or a municipal corporation makes it immune from ordinary execution and sale. 13. I. L. E., Execution, Sec. 3, p. 220.

It is said in *Lowe* v. *Board of Commissioners of Howard County* (1884), 94 Ind. 553, that:

> "The general rule is that property of a public corporation held for public or governmental purposes cannot ■ be sold under any legal process. Property of this description cannot be sold on execution."

In that case it was sought to levy upon a "public square" for a judgment against the county. It is interesting to note following the quotation above, the *Ketcham Case, supra,* is immediately cited on this limited proposition. Again in *School Town of Windfall City* v. *Somerville* (1914), 181 Ind. 463, 473, 104 N. E. 859, 863, it is stated:

> "It is well settled that property in use for public or governmental purposes cannot be sold on execution or other legal process."

Thereafter follows the citation again of the *Ketcham Case* on this principle alone.

It is our judgment and opinion that the *Ketcham Case* is authority for no more than what is quoted above. The opinion in that case was needlessly expanded in language to cover

matters not then in issue. The statements therein in excess of the principle stated above are pure dicta and not a precedent by which we ought to be bound.

Finally, we may not overlook the consequences of appellant's position and theory were it accepted, namely, such a position would place any governmental body or city in a legal straight jacket as to most of the property which it held. Once "dedicated" or named for a particular use, the use could not thereafter be altered or changed, as circumstances and times might require. It would create difficulties rather than eliminate them for us to add to the word "dedicated" the implied meaning of "irrevocable" and "in perpetuity," as urged by the appellants.

The position we take in this opinion is that which we think has been followed historically in practice in this State with reference to all the other property similarly designated on the original map or plat of the City of Indianapolis, whereon are designated "Governors Circle," "Market" (South Half of Square 50 and North Half of Square 48), "Court House," "University Square" and "State House."

The State Capitol is now located on an extension of Market Street, which was "dedicated" as a street in the original plat, as well as on part of a site conveyed to the City of Indianapolis as a "Market."

We have already mentioned how the "Governor's Circle" is now occupied by the Soldiers and Sailors Monument; "Court House Square" is now occupied by a City-County Building; "University Square" by a park; and the South Half of Square 50 designated as "Market" is an old canal. The history of this state has defined the principle of law which we announce in this case.

The judgment of the trial court is affirmed.

Hunter, C. J., and Mote, J., concur.

Jackson, J., dissents with opinion.

DISSENT

JACKSON, J.—I am unable to agree with the majority opinion herein and therefore dissent thereto.

For the purpose of this dissent I deem it sufficient to say that there has been no abandonment of the use of the "Market," "Market Square," or "City Market" being the South half of Square 43 located between the boundaries of Delaware, Market, Alabama and Wabash Streets in the City of Indianapolis, Marion County, Indiana. The land in question was dedicated for use by the public as a market place and is so used today. The only portion of such dedicated land not now so used is that portion thereof formerly covered by Tomlinson Hall. Tomlinson Hall was destroyed by fire. Subsequently the city razed the remains of that building and by its unilateral act caused that portion of the market lot to be used for parking purposes.

The trial court, at the request of the parties hereto, made a special finding of facts in this cause. Finding No. 8 thereof reads as follows, to-wit:

"8. Pursuant to Chapter 20 of the Acts of 1947 a deed of the tract here i n v o l v e d was executed by Henry F. Schricker as Governor of Indiana and James M. Propst, Auditor of the State of Indiana and recorded in the Office of the Recorder of Marion County in Town Lot Record 1409, page 293, which deed was dated November 15, 1950, and is in the form of Plaintiff's Exhibit 10 and is incorporated herein by reference. By such deed the State of Indiana conveyed all right, title and interest of the State of Indiana to the tract here involved to the Civil City of Indianapolis."

The deed from the State of Indiana purporting to convey the market lot (S ½ of Square 43) to the City of Indianapolis is a Quit Claim Deed conveying only any interest the State of Indiana then had in such real estate.

It seems clear to the writer that the only interest the State of Indiana could have had in the subject real estate, at the time of the attempted conveyance above mentioned, or for

that matter even now, is a speculative and contingent future interest predicated on an abandonment by the public of the use of that real estate for a market place.

It seems equally clear, that at the time the city (then town) was platted and the south half of square 43 dedicated to the use of the public for a market place, the city (then town) of Indianapolis was placed in possession of such land for the purpose of maintaining a market place thereon. That so long as there is a demand for such use and so long as the public will use such real estate for that purpose, the City of Indianapolis is required to make such use thereof. Until there is no longer any demand by the public for the use of such real estate there can be no diminution of the use, or abandonment, of said real estate by either the City or State and certainly there can be no vesting of any reversionary, or other, interest of the State therein. Therefore, the State of Indiana had no interest to convey in the subject real estate at the time of the execution of the deed to the City of Indianapolis.

The judgment of the trial court should be reversed and the cause remanded with instructions to grant appellant's Motion for a New Trial.

NOTE.—Reported in 226 N. E. 2d 886.